**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TERRY CIRRENCIONE,

         Plaintiff,

v.

WESTERN MICHIGAN UNIVERSITY
HOMER STRYKER M.D. SCHOOL OF
MEDICINE,

         Defendants.

Case No.

Hon.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
617 Detroit St. STE 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com

---

There is no other pending or resolved civil action arising out
of this transaction or occurrence alleged in the Complaint.

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

Plaintiff Dr. Terry Cirrencione ("Plaintiff"), by and through his attorneys, HURWITZ

LAW PLLC, brings this action against Defendant Western Michigan University Homer Stryker

M.D. School of Medicine ("Defendant") and hereby alleges as follows:

**INTRODUCTION**

1.     This is a disability discrimination and retaliation case brought by Dr. Terry

Cirrencione, a physician who matched to Defendant's Emergency Medicine residency program

through the National Resident Matching Program ("NRMP") in March 2025, only to be unlawfully

terminated after battling severe Graves' Disease with associated malignancy requiring a total

thyroidectomy.   Despite disclosing his condition to Defendant at the outset, completing all available onboarding requirements while recovering from surgery, and repeatedly proposing structured accommodations including immediate commencement of administrative and remote duties while undergoing Occupational Health evaluation for a phased clinical return, Defendant erected an insurmountable procedural barrier by refusing to engage in the legally mandated interactive accommodation process until Plaintiff was "officially employed"—a status he could not achieve without the very accommodations Defendant refused to discuss.   When Plaintiff discovered that Defendant's own Program Director and Program Coordinator had privately called him "full of shit," "a bullshitter," and stated that they did not believe his medical condition, the pretextual nature of Defendant's conduct became undeniable.   Days after Plaintiff acknowledged receiving a recorded voicemail capturing those statements, Defendant filed an NRMP waiver request and terminated him.   Plaintiff brings this action pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq*., seeking equitable, declaratory, and monetary damages for Defendant's unlawful discrimination and retaliation.

## PARTIES AND JURISDICTION

2.     Plaintiff is a resident of New Lennox, Illinois.

3.     Defendant is a private non-profit medical school located in Kalamazoo, Kalamazoo County, Michigan.

4.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

5.     Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391, as it is the district where the Defendant's principal place of business is located and where the events giving rise to Plaintiff's claims took place.

**FACTUAL ALLEGATIONS**

6.      Plaintiff matched to Defendant's Emergency Medicine residency program in March 2025.

7.      As soon as Plaintiff matched, he disclosed to the program that he was experiencing health issues related to Graves' disease that might delay his graduation but committed to keeping Defendant updated.

8.      Plaintiff suffers from severe Graves' Disease with associated malignancy requiring a total thyroidectomy.

9.      Plaintiff's graduation was delayed from May to September 2025 due to his condition's severity.

10.      Throughout the spring and summer of 2025, Plaintiff proactively completed all available onboarding requirements while still in medical school and before starting his position, including obtaining his Michigan medical license, completing HIPAA and remote orientation modules, obtaining his NIH Stroke Scale certification, completing ACLS and BLS modules, and submitting his medical school diploma.

11.      Plaintiff even offered to attend in-person orientation activities at his own expense during his medical school rotations to ease any disruption to the program.

12.      Although Plaintiff's original start date was July 1, 2025, he had not yet graduated. Nevertheless, he proactively completed all onboarding requirements, obtained his Michigan medical license, and offered to start on schedule.

13.      Defendant explicitly instructed him not to attend because it would "complicate his compensation" and told him to wait until after graduation.

14. On September 20, 2025, immediately upon graduating, Plaintiff contacted Defendant's HR department and Program Director Dr. Phillip Pazderka, Program Coordinator Kate Butler, and Resident Affairs Coordinator Mary Goggins-Farley to request ADA accommodations and ask for the process to submit medical documentation.

15. HR responded by providing ADA Medical Certification and ADA Request forms and scheduling a meeting to discuss accommodations.

16. Program Director Dr. Pazderka responded the same day: "We should set up a meeting to talk about the specific accommodations you're looking for."

17. Plaintiff underwent total thyroidectomy on October 29, 2025.

18. Plaintiff's postoperative recovery involved severe hypothyroidism with TSH levels reaching 55, autonomic instability, tachycardia, heart rate and electrolyte disturbances, marked fatigue, cognitive slowdown, lightheadedness, blood pressure shifts, and limited ability to drive safely.

19. Critically, Plaintiff's condition was improving on a predictable medical trajectory. His TSH declined from a severely hypothyroid level of 55 in mid-November to 7.5 by mid-January as his levothyroxine dosage stabilized.

20. Plaintiff's endocrinologist anticipated continued improvement as his thyroid replacement reached steady state, with an expected timeline of several weeks. This was not an indefinite condition; rather, it was a temporary postoperative recovery with an objectively measurable endpoint with thyroid hormone stabilization.

21. Plaintiff was capable of performing substantial residency duties immediately, even during recovery.

22.     Plaintiff successfully completed all remote onboarding modules, obtained his Michigan medical license, passed required certifications, and communicated regularly with program leadership, all while post-surgical.

23.     Plaintiff's limitations were specific and temporary and did not preclude administrative duties, educational modules, research activities, or clinical duties with temporary modifications—precisely the accommodations he requested through Occupational Health evaluation.

24.     Plaintiff remained under close endocrinology supervision and continuously communicated his recovery timeline to Defendant, requesting adjusted start dates and offering to provide physician documentation.

25.     On November 14, 2025, HR Manager Meg Baldry stated: "As we spoke about when we met, we cannot engage in the ADA interactive process until you are officially employed."

26.     Defendant created an impossible situation where Plaintiff could not become "officially employed" without attending in-person orientation, could not safely attend orientation without medical accommodations, and Defendant refused to discuss accommodations until he was employed.

27.     This procedural barrier was designed to prevent Plaintiff from accessing the legal protections he was entitled to receive.

28.     On January 13, 2026, HR Manager Susan Matlis reiterated: "we are unable to engage any further in the ADA interactive process until you are officially employed."

29.     On January 5, 2026, during a three-way call with Dr. Pazderka and Program Coordinator Kate Butler, Plaintiff hung up, but the other two remained connected. Plaintiff received an accidental voicemail recording their conversation: "***He reminds me of my ex-husband***

*who just tried bullshit his way through things*," "*I don't trust him one bit*," and "*He is a bullshitter*."

30. Dr. Pazderka later called Plaintiff to ask whether he had received a voicemail, before Plaintiff had discovered it.

31. This voicemail is direct evidence that Defendant's decision-makers disbelieved Plaintiff's legitimate medical limitations and harbored hostility toward his disability.

32. Plaintiff acknowledged receiving this voicemail in subsequent correspondence.

33. On January 11, 2025, just days after Plaintiff acknowledged the voicemail, Defendant filed an NRMP waiver request without informing Plaintiff in advance.  Dr. Pazderka subsequently told Plaintiff that "the pressure is coming from higher-ups."

34. Plaintiff immediately opposed the waiver on January 14, 2026, explicitly stating he did not consent to release and remained willing to commence residency training once medically cleared.

35. Plaintiff simultaneously reached out to his union representative, Jon Curtiss of AFT Michigan, who contacted Defendant's leadership and outside counsel requesting written clarification on whether "start by January 31" meant administrative activation or unrestricted clinical duties, and requesting a structured pathway for Occupational health evaluation.

36. Defendant's counsel rebuffed the union's inquiry, stating Plaintiff was "not a Resident at WMed" and therefore union communication was "inappropriate."

37. Thereafter, on January 26, 2026, Defendant issued an ultimatum through its Designated Institutional Official, Dr. Kelly Brown: start by January 30, 2026, or face termination.

38. Plaintiff responded requesting clarification on whether "start" meant administrative activation with phased clinical duties or immediate unrestricted duties.

6

39.     Plaintiff requested an Occupational Health evaluation to determine appropriate medical clearance and offered to begin all remote onboarding tasks immediately, noting he had already completed the required remote orientation and HIPPA modules in June and July 2025.

40.     On January 29, 2026, Defendant's Interim HR Director Kally Graham denied Plaintiff's request in writing, stating orientation and residency "are considered parts of the same process" without separate administrative activation, and that Defendant does not have an "administrative activation" separate from formal in-person orientation.

41.     Defendant refused to allow Occupational Health to assess Plaintiff's fitness for duty, with HR Director Graham stating in writing: "Occupational Health will not be able to assess your fitness for duty."  Defendant instead required physician documentation to go directly to HR— the same department that had refused for months engage in any interactive process.

42.     On February 16, 2026, NRMP granted Defendant's waiver request, and Defendant immediately terminated Plaintiff's Residency Agreement.

43.     The termination letter stated Plaintiff "remain[ed] unable to start and perform the essential duties and fulfill the essential requirements of the Program, with or without reasonable accommodation."

44.     Defendant never engaged in the interactive process, never allowed Occupational Health to evaluate temporary restrictions or a phased return, never explored alternatives despite seven months of communication, and terminated Plaintiff within days of learning he had evidence of their discriminatory statements.

45.     The termination cost Plaintiff an irreplaceable year of training in a profession where residency opportunities occur only once annually through the NRMP Match.

**COUNT I**
**DISCRIMINATION AND RETALIATION IN VIOLATION OF**
**SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794, *et seq.***

46.     Plaintiff incorporates by reference the forgoing paragraphs.

47.     Plaintiff was an "individual with a disability" or regarded as such during all relevant times.  29 U.S.C. § 705(20).

48.     Plaintiff suffers from severe Graves' Disease with associated malignancy requiring a total thyroidectomy.  Plaintiff's medical condition affects major bodily systems including the endocrine system, and his postoperative complications substantially limited multiple major life activities including working, walking, driving, standing for extended periods, and cognitive function.

49.     Defendant is a private, non-profit medical school that receives substantial federal funding, including through and is subject to Section 504 of the Rehabilitation Act.  29 U.S.C. § 794.

50.     Plaintiff was otherwise qualified for the position despite his disability with or without accommodation, as he completed medical school, obtained his Michigan license, and completed all required certifications.

51.     Defendant was aware of his disability from the outset, having been notified at the time of the March 2025 Match, again in April 2025, and again upon graduation in September 2025, and continuously throughout the fall of 2025.

52.     Plaintiff requested a structured, multi-phase activation: (1) immediate administrative start for non-clinical duties including remote modules, IT setup, and HR onboarding; (2) Occupational Health evaluation to determine clinical fitness timeline and any

8

temporary restrictions; and (3) phased return to unrestricted clinical duties based on objective medical clearance.

53.     This accommodation would have allowed Plaintiff to begin performing residency functions immediately while his postoperative thyroid hormone levels stabilized—a medically predictable process with an anticipated 6–8-week timeline.

54.     Defendant failed to provide the requested reasonable accommodation without conducting unindividualized assessment of his disabilities and whether they could accommodate him.

55.     Defendant failed to continually engage in an interactive process.

56.     Defendant was legally required to engage in the interactive process before terminating Plaintiff.

57.     Defendant erected a procedural barrier preventing any discussion of Plaintiff's accommodations, explicitly refusing in writing on multiple occasions to engage in the interactive process until Plaintiff was "officially employed."

58.     Defendant's procedural barrier obstructed the interactive process and prevented Plaintiff from accessing the legal protections to which he was entitled.

59.     Defendant's Interim HR Director confirmed in writing on January 29, 2026 that Defendant would not permit Occupational Health to evaluate Plaintiff's fitness for duty or identify a clinical start timeline—thereby blocking the very institutional mechanism that would have defined whether and when a phased accommodation was possible.

60.     Plaintiff was treated differently than similarly-situated residents and program participants who did not have disabilities.

61.    Plaintiff engaged in protected activity when he requested reasonable accommodations in September 2025 and repeatedly thereafter, when he formally opposed the NRMP waiver on January 14, 2026, and when he acknowledged receipt of the discriminatory voicemail in writing.  Plaintiff suffered an adverse action, *i.e.*, termination of his Residency Agreement, as a direct result of this protected activity, with the adverse action occurring within days of his acknowledgement of the voicemail evidence.

62.    The proffered reason for Plaintiff's, that his start delay had become "indefinite," is pretextual.  Defendant manufactured the "indefinite" characterization by refusing to allow Occupational Health to establish any clearance pathway or timeline.  Defendant cannot claim the delay was indefinite when it blocked the institutional process that would have defined that timeline.

63.    Defendant's actions were knowing, willful, and undertaken in deliberate disregard of Plaintiff's federally protected rights.

64.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer significant damages, including: loss of resident salary, a minimum one-year delay in the commencement of his medical career in a specialty where residency positions are available only once annually; delay in achieving attending physician status and the substantially higher earning capacity that accompanies it; emotional distress, humiliation, and damage to professional reputation; and attorneys' fees and costs incurred in prosecuting this action.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Dr. Terry Cirrencione requests the following relief from this Honorable Court against Defendants:

a.    Declare that the aforementioned practices and actions of Defendant constitute an unlawful violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*;

b.    Award Plaintiff compensatory, economic, and noneconomic damages in whatever amount Plaintiff is found to be entitled, including all lost wages and benefits, past and future;

c.    Award Plaintiff compensatory damages for monetary and nonmonetary loss in whatever amount he is found to be entitled;

d.    Award Plaintiff exemplary and punitive damages in whatever amount he is found to be entitled;

e.    Award declaratory relief;

f.    Award Plaintiff reasonable attorney's fees, costs, and interests pursuant to 29 U.S.C. § 794a; and

g.    Award such other relief as this Court deems just and proper.

Respectfully submitted,

HURWITZ LAW PLLC

/s/ *Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
*Attorneys for Plaintiff*
617 Detroit St., Ste. 125
Ann Arbor, MI 48104
(844) 478-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com

Dated: April 20, 2026

11

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TERRY CIRRENCIONE,

        Plaintiff,

v.

WESTERN MICHIGAN UNIVERSITY
HOMER STRYKER M.D. SCHOOL OF
MEDICINE,

        Defendants.

Case No.

Hon.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
617 Detroit St. STE 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com

---

## **DEMAND FOR TRIAL BY JURY**

Plaintiff Dr. Terry Cirrencione, by and through his attorneys, Hurwitz Law PLLC, hereby

demands a trial by jury of the issues in the above-captioned cause of action.

        Respectfully submitted,

        HURWITZ LAW PLLC

        /s/ *Noah S. Hurwitz*
        Noah S. Hurwitz (P74063)
        Grant M. Vlahopoulos (P85633)
        *Attorneys for Plaintiff*
        617 Detroit St., Ste. 125
        Ann Arbor, MI 48104
        (844) 478-9489
        noah@hurwitzlaw.com
        grant@hurwitzlaw.com

Dated: April 20, 2026